All rise. Illinois' Appellate Court, Third Division is now in session. The Honorable Justice D. Roy K. Martin, Jr. is presiding. Good morning, ladies and gentlemen. You may be seated. All right. Good morning, everyone. Counsel who are going to argue the case, would you stand up and introduce yourselves, please? Good morning, I'm Matthew Crowder for Kendall Carr. Zachary Slavens, on behalf of the people of the State of Illinois. And I apologize, gentlemen. If you step to the podium so that, and just speaking to the mic, we're recording the session, and so if you indulge me and just reintroduce yourselves. Matthew Crowder for Kendall Carr. Thank you. Good morning, Zachary Slavens, on behalf of the people of the State of Illinois. All right, very good. And as you gentlemen are aware, no doubt, we usually allow about 15 minutes for each argument. Counsel, would you care to reserve any time for rebuttal? Yes, Your Honor, I deserve five minutes. Five minutes, certainly. And if there is nothing else, certainly you may begin. May it please the Court. Counsel. As I said, I'm Matthew Crowder and I represent Kendall Carr in this appeal. Kendall was driving his daughter, seven months old at the time, to daycare as he went to work at UPS. When he realized he made a mistake, he forgot his work badge. A reasonable mistake for a new father. So he reverses down the block a couple of houses. It's on his hands, which is he's waiting outside his home for a few minutes. Some perennial work. Counsel, may I interrupt you for one second? Yes. The statement is brief. It alleges that the defense forfeited the issue of the propriety of the traffic stop. And that's where you were going, all right? And you must by night file a motion to suppress WASH. So is it forfeited? And if it's not forfeited, why not? No, this isn't forfeited. So we are bringing an insufficient evidence claim. Those claims are never forfeited. And in that case, there's actually no evidence to suppress. If Kendall would have filed a motion to suppress at the trial court, the state would say, well, you can't suppress evidence of Kendall's reaction to this stop. There's been a clear rule in the Supreme Court ever since. I'm going to butcher the conjunction for this. But Valerio says point blank. And in that case, Kendall's reaction and what he does to the officer's response is forthcoming violations. You can't suppress it. So there would be no reason to file a motion to suppress. And, again, this issue is whether the state proved beyond a reasonable doubt that these officers were performing an official duty in good faith. So, again, a motion to suppress is not needed for this. And it's just booking in the statute and determining the scope of where an official duty ends and whether the state's evidence met that standard. But didn't the state file a motion in limine to bar the defense from making that assertion during the trial? Yes, the state did bar evidence that the stop was unconstitutional and lawful. That a motion to eliminate should not have been granted, in our opinion. At the same time, though, the state still introduced evidence itself of the stop and the police officer's justifications. And at the end of the day, regardless of whether the stop was initially justified, the question still is whether these officers, during the course of this interaction, exceeded their scope or lawful power, whether they were no longer performing an official duty in good faith, and whether they were a ransom Kendall. So, while there was a motion to eliminate, Kendall should have been allowed to argue that the stop was unconstitutional. And it's still whether the officers are complying with these clearly established Supreme Court rules and department policies are relevant to whether they are performing official duty in good faith. So, for this petty theft stop, the police stopped Kendall for bursting down the street and double parking. And they entered his private property. They detained him after finding no problems with his driver's license, registration, or insurance. And they remained on his property even after Kendall told them to leave for trespassing. At that point, the police had not even asked him to exit his car. And this was also a key moment, because at this point, Kendall knew that these officers were not performing any legitimate police duty. And yet the police pressed on. And about two minutes later, after Kendall tried exercising his rights and told them to leave, one officer leaned into his car, put his hand on his gun, with his baby a few feet away. I'm sorry to interrupt you, but the videos, the one, the first video, which appears to be it, initially after the stop, there is no audio. Now, did the jury hear any audio with regards to that video? So, that's a video. All the videos were actually introduced twice. In the State's opening case, right, the case in Chief, they introduced the video without audio. In the rebuttal case, they introduced the videos again with the audio. So, the video that you're referring to, the initial stop, is actually Exhibit 5. It's the same one, but with audio. Okay. These videos are crucial, because they show exactly what is happening throughout this encounter. And at that point, which is approximately at the 2 minutes and 24 mark, or 47 mark, is when Kendall tells them to exit, because they were trespassers. But they don't, and they remain. These officers, at that point, were not performing an official duty in good faith. And Kendall knew it. The aggravated battery statute creates a protected class for those performing a legitimate public interest, by offering them enhanced protection. But when officers are not performing a legitimate public interest, when they are using their police power to harass people like Kendall, because their man gave him attitude, they should not be included in that protected class. So, this was not a legitimate traffic stop for a violation? No, this was not a traffic stop at all. The police refer to it as a traffic stop, but he's on his private driveway in his backyard. It's gated. His car is fully stopped. This was not on a public way. It's not a traditional traffic stop, as the case law and everyone envisions it. But did law enforcement take the position, though, that they saw him drive backwards down the one-way street before he got to his private parking pad? Yes. The officer also read a claim that they saw Kendall reverse down the one-way street. By the plain statute, they cited an impound or backing statute, a petty offense. It didn't violate that statute. You can only not reverse, it only prohibits reversing if it interferes with a car. If you look at it as it's antenna, right? But that begs the question, does it not? I mean, it may not have been a ballista. I don't debate that with you. But nonetheless, at the time, if the officers believed that he had violated the ordinance, was it not proper then for them to stop Mr. Carr? No, not really stop him on his private property. So, if they would stop him on a public way, right, if he was still double parked, he's still on reverse, he's still standing there, and they go off and they seize him and they stop him there, then we've got a normal traffic stop. But once he reached his private property, you think then that... That still changes it, yes. That changes the game under Lange, Collins, v. Virginia, and a lot of lines through court cases. Once he's into his private property, he not only has his protections for his property rights, but it's also a reasonable imputation of privacy. At that point, it would be the same as an officer seeing a parked car in someone's driveway and trying to go search that for a crime, right? We don't allow that. You can't just go on someone's private property and start investigating for a random crime. But isn't that argument forfeited, though? No, that argument is not forfeited. So, there are complexities to Fourth Amendment cases with these ag-bat cases. Officers do not need to strictly comply with the Fourth Amendment. We accept that. But these Fourth Amendment cases still inform us about what officers can legally and lawfully do and what they can't do. And particularly important is the good-faith exception cases. Because in those cases, the courts are looking at whether a reasonably trained officer should know that what they're doing is not allowed. And you're like Macintosh. People v. Macintosh. Yes, people would be Macintosh, yes. We said that case a lot. So, that case was actually moving to withdraw his guilty plea. And complicating that case further, he also claimed that he should have, his counsel should have suppressed the evidence, right, from the stop, which would have affected whether the officers were performing official duty. But again, there's nothing to suppress, right? A strict Fourth Amendment violation is not going to dismiss the case and it's not going to suppress evidence. A lot of these cases, when they're talking about these Fourth Amendments not being relevant, that's what they're referring to. We're not going to suppress a case, and a slight violation is not going to mean that this officer is performing subject to scope. But that's not the case here. Well, how do you distinguish Macintosh with the statute? Because you say good faith, but yet the statute doesn't say anything about good faith. Yes, the statute doesn't say good faith. But if we look at the cases like Macintosh and Smith, and a lot of the older cases on Zadkatz, they're talking about police doing pretended duties of policemen. They say things like harassment or doing things for, you know, personal benefit or personal joy. Those are outside the official scopes and official duties. So, there is a limit to it. And this good faith exception for Macintosh is a reflection of what that is. Public works are reviewed when they're looking to see an officer is actually performing a duty. They're looking to see whether they're actually doing a real, legitimate police interest, right? They're not looking to see if this guy is just pretending to do something with his authority as a police officer and abusing it. So, that's where this good faith language is coming from. And it's similar to, I would say, self-defense cases where there were jury instructions, right? It's very limited for what the jury has to consider. But on the public review, there's a whole list of factors that public works look at to see if the state's evidence actually disproves self-defense. So, this good faith exception, this good faith rule kind of acts in the same ways. But public works look at and determine if these officers were really performing something legitimate. And again, going back to these videos, there's a few key moments where we know that not only are the officers not doing anything legitimate, but Kendall also knows they are not doing anything legitimate. The first moment happens at about 2 minutes and 47 seconds. At this moment, Kendall had given the officers his driver's license and registration insurance. They ran it. They found no problems. Officer Reddick does not even try to write or fill out a ticket or a warning ticket. He gets back to Kendall's car, and he does not address the improper reversing. He does not address the double parking. Instead, he starts accusing Kendall of driving recklessly with a baby. Those were not the points that he stopped Kendall. Those were not the reasons they went to his private property to start investigating and interacting with him. At that point, their original purpose, that traffic stop, had ended. And there was no point for them to be on this property. And by switching up the reasons that they're talking to him and investigating, Kendall is realizing these guys are not really here for the double parking and those persons down the street, and that they were going to continue no matter what he said. If he had known at that moment, he knew it about 20 seconds later. Well, my apologies. That first moment was at 2 minutes and 24 seconds. The second moment is at 2 minutes and 47 seconds. This is the moment where Kendall tells them that they are trespassing and to leave. Well, at this point, the officers never told him to exit. He's complying with all their commands. He's rolling down the windows when he told them to. He gave them valid driving information. They ran and they checked it. And then Kendall told them to leave. At this point, these officers are not acting like anything else than trespassers. And Kendall knows that there's no reason for them to be in this driveway. The state seems to argue or does argue that all of the conduct that you're speaking of really is not relevant to the battery in that it was Officer Sijorski who was the person which the aggravated battery charge pertains to. Yes, there are three reasons why that position doesn't matter. And the state is incorrect about that. So first, in all these cases, we're looking at thefts or obstruction in resisting cases. We're looking at the police officers' actions together. That's what happened in Borders and McIntosh. We're looking at whether the officers who are acting in concert with each other during the stop, right, are collectively acting lawfully or unlawfully, which is what we do. It's similar to our collective knowledge doctrine for officers. If officers are on a scene and they're acting together, we assume and impute each of their actions and knowledge onto each other. So there's no reason to actually differentiate between the individual officers and their actions. Even in the state's case, Smith, that they cite for, Smith actually considers the acts of two separate officers, right? Their non-contemporaneous quote-unquote was about acts that occurred two days apart, not two different officers. The second reason, and more importantly, Kendall's knowledge that these officers are performing official duty, right, is an element that the state had approved. What these officers were doing when they first interacted with them, what the two initial officers do, are relevant to what Kendall knows about these officers, whether he believes that they are actually performing official duty, and whether he thinks that these cops are just harassing them. And this incident was quick, right? Between, within the first four minutes, right, the officer had opened up his car door and already put their hand on a gun, feet away from their baby, right? It's a quickly escalating situation. Counselor Scott, too, there's nothing to say that he did not think Officer Surgiski was not there with them. State had approved that Kendall knew that these officers who invaded his private property, or detained him in his bed, or continuing to escalate the situation and agitate, were performing official duty in good faith. He has no reason to differentiate this chaotic encounter, what each individual officer is doing. And third, even if we look at just Officer Surgiski's actions alone, he was not acting awkwardly. First, he got to the scene for a traffic stop. He goes onto a private gated property. That should be his name, gated. Where was it gated? It's like a gated fence in the back. It's a cyclone fence on the side, but it wasn't gated. No, so the back is gated, but it was open because Kendall just parked his car. You can see the shot, right, when Officer Rare is walking back to his SWAT car. You can see there's a back gate behind the driveway. It was just open for any parked. But second, the officers, when they ordered Kendall out of the car, were not arresting him. Right? They ordered him out of the car. It was, quote, provided one of them man-on-man conversation with him. Kendall said, no, they were already having a man-on-man conversation. And then Officer Rare told them that they were not planning to put him on handcuffs, and they would just like him out of the car. So these officers were not planning to arrest him. And it's also not clear that there's any of that they could arrest him for at that point either. So when Surgiski arrived to the scene, he was not assisting those officers in any lawful police act. People B Gallagher, right, explains this. There is no lawful reason to detain Kendall at this point here. So these assisting officers, they're not acting lawful themselves. They're joining in on this unlawful police act. Counsel, I'm going to ask you to wrap up so that we give you reason to apologize. I apologize. Yes. I just have a question, though. So are they acting as police officers or not? Because it seems like you're flip-flopping here from what's in your briefs, what was argued at trial, and now here. I mean, so I'm not quite clear if you're saying that Kendall knew that they were police officers acting in an official capacity, regardless of, you know, the circumstances, or they were not. You, the police officers were not acting as legitimate police officers, and they weren't performing a legitimate police duty at this time. At trial, counsel was barred from contesting the illegality of the stop and the constitutionality. But he still contested that these officers were not justified and were still escalating the situation, and that Kendall had done nothing wrong. So when Kendall spits on Officer Zaworski, I mispronounced it, I apologize, so does he know that he's spitting on a police officer or he's not? He knows that he's a police officer, yes, but not a police officer performing official duty. The aggravated battery statute is not a status crime, right? And he was aware of the statute at the time. No, he's not. There's no argument at trial whether he was or wasn't. But the knowledge that the state still had to prove was that they knew he was a police officer performing official duty, right? Whether he read the statute or not doesn't change the fact that it's what the state has to prove. And again, it's not just a status crime that he's a police officer. I'm going to wrap up again real quick. These acts show that they were unlawful and were not actually performing any official duty, but to harass Kendall because he gave him the attitude. Thank you. One second, Justice Breyer. Okay, thank you, Counsel. Good morning, Your Honors. May it please the Court. My name is Zachary Slavens, and I represent the people of the state of Illinois. Responding to calls for assistance in performing arrests are part of the official duties of police officers. Officer Shersky was performing those duties when defendants fit on his shoulder while being loaded into the back of a police cruiser. Any questions concerning the inception of the traffic stop and its escalation all occurred prior to Officer Shersky's arrival on scene and are not relevant to the offense that defendant was convicted of. Just to interrupt you for a second. So did the state file a motion in Limine to bar the unlawful arrest or the arguments for unlawful arrest, or did you not? The trial. Based on the record here, there is a motion in Limine discussed prior to trial. There is a ruling when defendant starts to get into that issue during the course of trial. The motion in Limine does not appear in the record for whatever reason, but the inference to be drawn from it is that there was a motion in Limine to preclude that line of questioning. And that would certainly be correct, as the issue was not litigated prior to trial. Questions about the Fourth Amendment are legal questions that are properly resolved by the court, not the jury. That issue should have been litigated prior to trial, and it was not. And it's precisely why it's improper to get into those issues on appeal. The record has not been developed with respect to the Fourth Amendment question. The trial court has not had an opportunity to consider those questions, hold an evidentiary hearing. And that's not really a matter that can be gotten into when within the confines of reasonable doubt, particularly where this crime was charged for defendant's acts against Officer Shersky, an individual who was not involved with the traffic stop or its escalation. And People v. Smith held that the court is concerned with the acts contemporaneous to the battery and what the officer victim was doing at the time. Officer Shersky responds to a call for officers in need of assistance. He arrives. Within about 30 seconds, they are removing defendant from the vehicle and placing him in cuffs. He doesn't have time to speak with the other officers and ascertain the situation, necessarily probe into the depths of Fourth Amendment jurisprudence with them. He's responding to a call for assistance. He's participating in effectuating an arrest. And as defendant himself acknowledged, for purposes of aggravated battery of a peace officer, the courts are not necessarily concerned with whether or not every aspect of Fourth Amendment jurisprudence was followed for determining whether or not an officer was performing their official duties. The courts look to, is this part essentially of the job description of being a peace officer? Here, responding to calls for assistance, participating in arrests, those are unquestionably part of the job of being a police officer. So is it necessarily forfeiture that the issue wasn't raised? What you seem to be saying is that it was an irrelevant issue. So how was the defendant to raise it? How should the defendant have raised these Fourth Amendment issues? That would have been through a pretrial motion before the trial court motion eliminate. So the trial court could examine what happened, whether or not a Fourth Amendment violation occurred, and what the consequences of such a violation would be. But the defendant is saying today that a motion would not have been appropriate because the issue is that the case law on ag battery does not require that element to be proved. Sort of, it gets kind of circular, doesn't it? Yeah, and that's part of the difficulty of the record here. Because this was never raised below, we don't quite necessarily know what the trial court was going to do, and we can't really speculate what would have been the consequences of filing a motion, what arguments would or would not have been made below. All we know is these questions weren't litigated below, so we don't really have that record before us and can't really delve into it. As Your Honor Reyes noted, you know, there's a question about whether or not there's a gate, what kind of gate, how big it is. We don't really know. It's maybe a glimpse of one in the video for a few seconds, but that's certainly something that could have been developed. You know, those are the matters that are quite important for assessing whether or not something is part of the curtilage of a home. This wasn't litigated. We don't have that record. Was it not litigated because of the State's motion in limine? Well, the motion in limine was presented prior to trial. That wouldn't have precluded the defendant from filing his own pretrial motion challenging the traffic stop, and the defendant didn't file any such motion. It wouldn't have precluded them from engaging in motion practice prior to trial. But, again, all of this that the defendant is arguing in his brief today in front of this court is talking about Officers Herrera and Moreno, who engaged in the traffic stop. Those are acts that occurred prior to Officer Shersky arriving on scene, and he is the relevant officer here. He is the one who was spit on. He is the officer victim here. But let's say, okay, they stop him. He gives them their driver's license, his registration. They check it. Everything comes up good. He goes back, hands it to them. It's a traffic stop for driving. It should be over, right? Then it escalated. And it seems like the officers participated in this escalation with regards to the conversation that's going on that's becoming more and more, as time goes on, more and more heated, and particularly with the fact that there's a baby in the back of the car, and as they're arguing that one of the officers doesn't pull out the weapon but he touches the weapon and indicating that, you know, without saying it, you know. I have to. I have to, right? Just a few points in response to that, Your Honor. First, again, those are acts that occurred prior to Officer Shersky arriving. Second, the traffic stop wasn't over. As the body camera shows, and consistent with Officer Herrera's testimony, he finishes running the driver's license check. He gets out of the car. Prior to re-approaching the defendant's vehicle, his partner signals and speaks to him and lets him know the defendant was making furtive movements throughout the vehicle. So prior to proceeding any further with the traffic stop, Officer Herrera's testimony was given the defendant's demeanor, and now that he's making furtive movements, they were concerned that there might be an escalation from the defendant. So they were trying to ensure their safety, first and foremost, before proceeding any further. The defendant was cited for those traffic offenses. He hadn't been given his ticket yet. So this traffic stop was still in progress when it escalated. The officers, as the video showed, remained remarkably calm. And the matter just unfortunately proceeded, got more tense, more tense. But the traffic stop was still in progress at that point. So even if the court were inclined to get into some of these issues, again, because this is framed as a reasonable doubt challenge, the record, all inferences, all reasonable conclusions must be viewed in the light most favorable to the conviction. And here the testimony is clear. They saw a defendant backing up the wrong way down the street. That might not be enough to sustain a conviction for the offense, but it's certainly reasonable articulable suspicion to engage in a traffic stop. There's a reason that they followed him. Officer Herrera testified he was pulling up right behind him to curb him, got close to the car when the defendant sped off. That's the reason they followed him. The traffic stop extends because defendants' conduct is putting them at fear of being able to safely conclude this traffic stop. And before they go any further, they have to at least ensure that they can do so safely. When that gets out of control, that's when Officer Shersky is called. He arrives on scene to this already in progress. He's responding to a call for assistance. He's assisting in an arrest. Those are official duties. And even if any of those prior acts by the other officers might have technically run afoul of the Fourth Amendment, the cases including McIntosh, which is where a defendant finds his good faith language, even that case establishes the court does not look to strict compliance with the Fourth Amendment for purposes of aggravated battery of a peace officer. If there are no further questions, Your Honors, for these reasons and those stated more fully in our briefs, we prospectfully ask this Court to affirm defendant's conviction. Thank you. Thank you. So there are three main things that I want to address in this rebuttal. So first with this forfeiture argument again. So this issue is not like it was never raised below or never litigated, right? The motion eliminated with the trial court barred Kendall from presenting evidence that this stop was unlawful. He brought that up also in his post-trial motion claiming that it was an error that they did not allow him to contest that the stop was unlawful. So it wasn't like there was no litigation about these officers' actions being illegal. And second, the law is clear on this. The state keeps saying that they should suppress or file a motion to suppress, right, litigate this issue. But what would he move to suppress? What evidence have they identified that would have been suppressed from a Fourth Amendment motion? Nothing because there is no evidence to suppress here. What his words are during that conduct and his state, you can't suppress that from a motion to suppress. His reactions to the police are not something that you can suppress. There would be no point to filing a Fourth Amendment motion. And the state would argue that exactly if you tried to do it. There's no point to this. All the cases that we've cited are brief. Cassidy, Campbell, they look at this same exact issue, whether officers are performing within their official duty and are reviewing it under a sufficiency of evidence. They're not saying it's forfeited. They're not saying they have to bring a Fourth Amendment claim. Cassidy addressed this claim, the exact same claim, and there's no problem with forfeiture or a motion to suppress. Second, the state says that these officers were justified because they were afraid of Kendall. The video, Exhibit 5, disproves this. There is one particular moment that shows that these officers are never really afraid of Kendall. After Kendall gives them attitude at first, after he mouths off, these officers are picking and agitating everything he says, right, to provoke him. They're trying to agitate him. I'm sorry to interrupt, but what about the state's argument that all of that is irrelevant with regards to Officer Zaworski and what happens with Mr. Carter? Yes, so, again, these officers are acting in concert, right? When we looked, even for the Fourth Amendment motion that the state wants us to file, right, you'd be looking at the officers' acts together because they're acting as one here. And Kendall Carter cannot differentiate these individual officers and what they're doing. He doesn't even know that Officer Zaworski hadn't arrived initially. He's partly in his car looking forward the whole time. There's an unmarked car in the alley blocking his way. He doesn't know that there's no other officers on the scene here. And now, with this specific Element of Antiproof, it says so in the jury instructions on page 272, 472, and 473. It's its own specific proposition that they have to prove he knew they were performing official duty. So these acts beforehand, first of all, should be all imputed with each other. We should consider it as one. That's what cases like Borders have done. And the jury instructions specifically say they have to prove knowledge. So what these prior acts have never happened before, these unlawful violations, are relevant to his knowledge. But second, to show that these officers, there's a really good example to show these officers were not really afraid of Kendall. Evan Moreno grabs his gun. Panic strikes Kendall. He's fearful. He calls up his relatives. He calls up his baby's mother to let him know that these officers have now put their hand on a gun, and he's afraid that they are going to kill him. He calls him up to let him know what is happening. Kendall's mom arrives on the scene. And at the 6.50 mark, Kendall's mom asks the officers if she could pull the baby out of the car, if she could remove the baby from the situation. Officer Loretta tells her no. He tells her, ma'am, there is nothing to worry about. This shows that these officers are just mad that Kendall gave them attitude. They are mad that they believe he's being dramatic, and they are picking and choosing. They are agitating, trying to twist his words to justify their actions here. There's no real fear in what they're doing. Even these phone calls that they're making, Kendall told the officers right beforehand, I'm calling my dad. Officer Loretta says, I hear you. Is he inside? He's not really worried about this. He's not worried about any other phone calls either, because they're all on speaker. He could hear Kendall's mother of his child talking. He could hear his mother talking. He's telling him where it's at. At one point, Kendall even mentions that he's worried that his police officers are going to pull some Second Amendment on him. And Officer Loretta is quick to jump in. Oh, what do you mean by Second Amendment? Because he wants to take that and twist it, and there's no reason why they can do what they do. And for these initial verbal movements that they're talking about, they're just, again, a non-existent concern. Watching the video, Kendall hid nothing throughout the entire stop. His car door was open. Officer Loretta felt so comfortable that, in the beginning of the interaction, before any further movements, he got within a foot of Kendall, even opened up the door further, and he put his hand on top of the roof of the car, reaching towards the center console and reaching towards the passenger seat. That was where the information, his driver's information, his license and his registration, that's where he kept it. When Officer told him to grab it, you could see him reach towards the center console. You could see him move clothings on that passenger seat. They're just trying to say, oh, he reached towards this so we're concerned for his safety. He was parked on his driveway, and all he did was double park while taking his daughter to daycare. He reached towards those areas because they told him to. That's where his information was. Now we're trying to take that and say we're afraid because he reached towards those exact areas we told him to reach towards. It's more evidence that these officers were not out there doing anything legitimate. They were mad. Well before this happened, well before they pulled him out of the car, this stop should have ended. Not only if they filed an appropriate amendment, but if they filed their own apartment policy, they would have never gone out to his driveway. Apartment policy says, you see a parking violation from municipal code, you either fix the ticket to his car or you mail it to him. It says if you find a municipal code violation and you want to search private property and go on to private property for it, you've got to do a special search warrant. These officers ignored their apartment policy. They ignored these clearly established Supreme Court rules. They ignored all of this because Kendall gave them an attitude. This is not the legitimate public interest that they aggravated in every statute. It tends to cover. We don't cover, they're not getting special protections just because they're a police officer. If this legislator wanted the statute to cover that, they could have easily just said, aggravated battery is any battery to a police officer. But they didn't. They limited it to them performing official duty. And if there's no more questions, I would ask that this Court reduce Kendall's felony aggravated battery conviction to misdemeanor battery. Thank you. Thank you both counsels. We will take the matter under advisement and shall issue an order in a reasonable length of time. We thank you all for your participation. And with that, this matter is concluded.